It's Michael Van Zandt for the Board of Directors of the Truckee Carson Irrigation District as class representatives of over 4,000 water right owners in the Newlands Project and also for the Truckee Carson Irrigation District. Your Honors, this case turns on the concept of water law and that is the basis, the measure and the limit of a water right under the 1902 Reclamation Act is beneficial use. Any attempt by the Secretary of the Interior to reduce water duties below that necessary to achieve beneficial use is without effect and that was decided in Ickes v. Fox in 1936 by the D.C. Circuit upheld by the United States Supreme Court. The water, the beneficial use, the farmers who are involved in this case, they own the water rights and not the United States nor the Pyramid Lake Tribe. The Secretary's orders setting a water duty at any amount less than that necessary for beneficial use was struck down in Ickes v. Fox by the United States Supreme Court in 1937. In 1944, we have the Ordich Decree which has confirmed the 3 1⁄2 and 4 1⁄2 acre feet per acre for the Newlands Project. The federal water master who was appointed by the court has always extended the 3 1⁄2 and the 4 1⁄2 acre feet to the entirety of the Newlands Project. In the Alpine case, in 1925, there was a temporary restraining order that was issued and that set a — I'm sorry. What year was that? It was 1925. A temporary restraining order was issued in the Alpine case. It was the United States v. Alpine Land and Reservoir. The longest running temporary restraining order in the history of the — It's a very long restraining order, Your Honor. And it was entered based on a net duty of 2.92 acre feet per acre based on 80,000 acres of unidentified lands. But the U.S. position in that case ultimately became that the water duty should be 3 acre feet per acre. The special master in the case recommended 3 1⁄2 and 4 1⁄2 in conformity with the Ordich case. The Alpine court issued in 1980 a decree which set the water duties at the 3 1⁄2 and the 4 1⁄2 based on 10 years of history. But let me ask you. Can I ask a question about that? Yes, Your Honor. All right. So here's — I have in front of me page 888 of that opinion. And it says that. And then later it says that you have to — in order to figure out what the actual use is of the water, that you have to subtract rainfall and so on, and that the consumption — consumptive use of irrigation water is 2.99 acre feet per acre for the Newlands Project. Why isn't that the relevant number? That is not the relevant number because that is the actual number that the plant uptakes or evaporates as you go through the irrigation process. That is called the consumptive use portion of the water duty. You still need on top of that another 0.6 acre feet or 1.6 acre feet to actually apply the water to the field so that you can achieve the consumptive use portion of the 2.99 acre feet. Counsel, am I not right that the notion of beneficial use, which is the controlling one here, and these limits that are set — the limits that are set are maximum potential? They don't necessarily continue on forever, as I — I was looking at the Alpine Court of Appeals opinion by then-Judge Kennedy, and I have over here at page 855 the one that talks about beneficial use being a dynamic concept which is a variable according to conditions, and goes on to say that looking — that the district court in that case was correct in looking at what was then current as the basis for determining beneficial use. I simply wanted to ask the question of you whether, since this is not really before us at this point, the way the district court dealt with it, whether the quantification is something that is really for the future so far as the owners of the rights are concerned. It's contrasted with it being graven in stone as of the numbers that were applicable, let's say, under Alpine land. Well, the conditions can change. It may affect water duties, but right now the water duty is set at 3.5 and 4.5, and as you indicated, they are the maximums. That's the maximum. But they're also the minimums that are set by allocation by the Bureau of Reclamation for the project. So any farmer during the irrigation season has the right to call on 3.5 or 4.5 acre feet during that season, and in reality, the farmers will use a little bit less, about 7% less. Just depends on the temperature, the wind, all kinds of different things like that. They don't have an incentive to over-irrigate their fields. But in this case, because of the 2.92, what happened was the Bureau of Reclamation prepared a report, and they indicated that if the 2.92 is applied to the Newlands Project for that 288,129 acre feet number that was the maximum allowable diversion, only 46,000 acres could be irrigated in the Newlands Project when there's 73,700 acres under contract and about 63,000 to 65,000 that are actually irrigated. So you have something like 15,000 to 17,000 acres that receive no water under the 288,129. But as I understand it, the district court recognized that in a way this whole decree may be fanciful because he didn't disturb the water duties of any of the individual landowners, and he therefore said at the end, I don't really know how it is that we're going to get the water back from the Irrigation District and still not affect the water delivered to the landowners. And as Judge Shader is pointing out, that's sort of all down the road. No one's dealt with that, and it may turn out that nothing happens as a result of this decree. That's really not our problem at the moment. Well, we have a difficulty because with Judge McKibben's order, obviously, there is a certain amount of water that TCID is required to repay. It really comes right out of the backs of the farmers. I understood him to be saying, yes, but you can't do it in a way that affects the water duties. So I don't know how you're going to do that, he says, but we'll figure it out later. That's not our problem right now. No, it isn't. And, you know, what I want to say is that the 2.92 was embedded into that temporary restraining order. It's in the nature of an injunction. So when the Alpine decree came out and changed the 3.5 to 4.5, abrogating the 2.92, that's a complete nullity at that point. It's as if I was — But he — he, the district judge, therefore, didn't give them any water after the Alpine decree came out. After 1980. Right. But the reality is if I was enjoined from using a certain piece of property, but I have an entitlement to do that, and I go through the case and I prove that I was entitled to Now, the injunction cannot be then used to enforce a time period where I may have used that property during the period of the injunction. It's a complete nullity. I could have been held in contempt during the time period the injunction was in place, but that didn't happen here. The injunction itself is dissolved, it's abrogated, and now we have a decree that says 3.5 and 4.5 is the water duty. And the historical time period that was used by Judge Thompson when he decided the Alpine decree was from 1969 to 1979, right in the period that we're talking about here for recoupment that the United States was pressing. The injunction here is not enforceable, and we cite to the Latrobe Steel case and also to the Trans-International case for that proposition. And it's interesting in the TIA case, which is a Ninth Circuit case, a judgment of civil contempt being remedial in nature, stands or falls with the validity or invalidity of the order, and the opposing party should be compensated only if he was entitled to the order. The United States here does not respond to this argument. So what we have is a classic injunction that is resolved in the favor of the water right owners. Yet the United States here, as it has done many times in the past, is attempting to reallocate the water away from the district to the Pyramid Lake tribe. And that is not proper in this case because that injunction, in fact, turned out to be erroneous when the Alpine court finally got through its process of analyzing the situation. Well, what the Settlement Act says, all actions taken heretofore by the Secretary under any operating criteria and procedures are hereby declared to be valid and shall not be subject to review in any judicial or administrative proceeding. So why doesn't that validate the OCAPs for the period they were in effect? Well, Congress is validating the implementation of the OCAP, presumably during that time period, 1973. Now there were no OCAPs in place after 1980, until 1985. So that is not at issue here. But I don't think the ---- You're trying to tell me that the OCAPs were retroactively invalidated by the Alpine decree. The 1973 OCAP was retroactively invalidated by the Alpine decree. But I'm agreeing with this provision that seems to say that Congress says they're valid. Well, but they also say that they're not going to interfere with any vested right in a decree under 210B13 or 101618. Well, so they're saying contradictory things, but it certainly doesn't seem that they ---- maybe they're saying contradictory things, but some effort to reconcile them seems to be what the Court ought to do. And it is what the Court did by saying, well, up until 1980, they're reconcilable, so that's what we're going to do. Well, I don't believe that the Congress, first of all, knew what the facts were. That doesn't matter. What matters is what they said. Well, what I'd like to turn to is that the mere fact that the Secretary invoked his regulatory powers to incorporate the 2.92 into the regulation does not make it any more of a legally valid position by the Secretary. As I indicated, the United States knew that there was going to be shortfalls in deliveries during the time period that we're talking about, 1973 to 1987. They never enforced the provisions of the Alpine TRO. They did send some letters to TCID, but they never took action to actually enforce them. As indicated, 16,000 acres in the project would have been shorted. Now, TCID has obligations both as a political subdivision of the State of Nevada and as a contractor for the federal government to comply with the federal laws, which is the Reclamation Act. That requires them to comply with the beneficial use requirements. It also requires them to comply with Nevada law, which also has that same beneficial use provision in it. What we're looking at here is a restitution. This is equitable restitution, as Judge McKibbin has construed it. And in that particular case, we're talking about a situation where restitution restores property that properly belongs to the plaintiff that is in defendant's possession. TCID does not have any possession of this water. It's purely a manager. It operates and manages the project. It doesn't possess the water. What effect do you give to the term recoupment, which is the standard, as I understand it, that is applied and that authorizes some action by the district court? Well, the authorization, as Your Honor notes, is in 11618, is for the Secretary to pursue recoupment. And recoupment is a concept that is a defensive action if a plaintiff files an action against somebody. Defensive action? Recoupment? Yes. By the defendant. That's not the sole meaning of the term recoupment, is it? Well, in the dictionary, you know, it says to obtain something that belongs to you from someone else. That's essentially what the definition is. And here, the United States does not own this water. If somebody else has taken an excessive something and authorization is given to seek recoupment, doesn't that constitute a permissible use of that term? Indeed, the most logical one? Well, that is the way that Judge McKibben construed it. He construed it as equitable restitution. And that's ultimately how he cited the cause of action was pled. But equitable restitution requires that the property belong to the person who is claiming they should be restored. And the United States does not own this property, Your Honor. It's not that, not exactly that. If someone has taken an excessive amount, as was found here, and there's an authorization to seek recoupment, isn't that a permissible, not only permissible, but as I say, the most logical use of the term recoupment? Well, you talk about, you know, you're accepting, you're asking us to accept the premise of ownership when, in fact, as you yourself have acknowledged, the limits that were set there were maximum amounts, not, and that gets us back to the question that Judge Berzon has posed, and that is, we don't know what's being, what ultimately may happen here under the form of this decree. Well, the water duties are both maximums and minimums. But I agree with the premise that restitution means that if somebody has something and acts as what they're entitled to, they should give it back to its rightful owner, but the rightful owner is not the United States and it's not the tribe. Well, but isn't the point of this that the water would otherwise flow into the lake, which would assist the fisheries, that this is all, that this whole thing is all, the struggle is all about between the irrigation and the fisheries. So in that sense, the United States for the tribe is trying to recover what is going to benefit the tribe. Well, but you still have to, you still have to have a water right, and they don't have a water right to the water that's flowing to Pyramid Lake for fisheries. That was decided in Nevada versus U.S. in 1983. I reserve some time for the state of Nevada, and I also have some rebuttal. Thank you very much. May it please the Court. I'm Michael Wohl, Senior Deputy Attorney General for the state of Nevada, appearing today on behalf of the state of Nevada and its Department of Wildlife and Division of Water Resources. The 1973 OCAP was inconsistent with the findings of the decree courts. This court has noted that the district court below was correct in denying recoupment for the period of 1980 to 1984 because it was inconsistent with that finalized decree. The tribe has asserted in its briefs, however, that the 1973 OCAP is consistent with the decrees. That's incorrect, however, as a factual matter, and that is clearly evidenced by the fact that the OCAP was eventually altered in 1985 and significantly increased the amount of water that could be diverted in large part to account for the amount of water to which the decree, the water right holders were entitled under the decrees. This is also supported by the analysis that went into that change in the OCAP. The district court, however, erred in failing to award the state of Nevada its costs of suit. The U.S. and the tribe both alleged that the state of Nevada and the other water right holders within the project would be liable for repayment of water that was wrongfully diverted. Since the district court determined that the state of Nevada was not liable in recoupment and entered a judgment in the state of Nevada's favor, the legal relationship between the parties was materially altered, and Nevada must be considered a prevailing party for the purposes of this suit. Well, that depends on a factual question as to which there's a dispute, and that is whether the government was ever seeking to get recruitment from the landowners, including the state of Nevada, or was only ever seeking a binding decree which would at least bind them to whatever the decree was, which in a sense just does not affect their water rights. Well, I would direct the ‑‑ I think the controlling document here is the United States complaint, and they specifically alleged in paragraph 14, each and every water right user in the project will become liable to return such waters as were improperly used to supply the river, and stated elsewhere that they were seeking an order directing restitution from all defendants, including the state of Nevada. That was reiterated. But ultimately, you know, pleadings don't necessarily control what happens in lawsuits. In fact, the converse is true, and ultimately what they did was to make it plain that the only reason that they wanted the water users, the owners of the water, to be in the thing was so that they would be bound, and therefore wouldn't be able to sue later on, claiming that they were not bound by the decree. Now, in that sense, when you talk about prevailing party, didn't the government ultimately seek and obtain what it was after vis‑a‑vis your client? I don't believe that's correct. First of all, it wasn't merely the complaint that asserted these facts. The United States argued aggressively, in its opposition to the motion for summary judgment, that the individual water right holders would be liable for recoupment, and that they could be not, since they were part of TCID, could not be heard to complain if their water rights were taken. And so from that standpoint, it was only until very shortly before trial that the United liability. They alleged it, they failed to prove it, and so that changed. The state of Nevada was involved in this lawsuit specifically because it was alleged that we would have to repay water if they were able to prove their case. The judge made specific findings that the state of Nevada was not liable in recoupment. That makes the state of Nevada a prevailing party, and they were entitled to costs. The matter should be remanded, then, to allow the court to either order costs for the state or to explain why this is an unusual case where it is not appropriate. If there are no further questions, thank you. May it please the Court, Katherine Barton for the United States. I'm going to attempt to take 13 minutes of our time and leave seven for Mr. Springmeier, who's representing the tribe. First of all, I'm hoping to spend most of my time on our appeal issues because the question of whether TCID is liable for any repayment of water, I think, is absolutely clear. The Settlement Act directs the Secretary to recover water that TCID unlawfully diverted in violation of the OCAP. Well, it doesn't specifically say from TCID, it just says recoupment. Well, recoupment, right, but I mean, I don't think that has any effect that means anything. I'm just talking about the alpine argument. It's what we are supposed to do is recover for violations of the OCAP, right? And TCID admitted in its filings and repeatedly admitted that it violated the OCAP. It did so intentionally, defiantly, willfully, and this Court in TCID v. Secretary, affirming the District Court decision when they sued to invalidate the OCAP, said that TCID intentionally violated the OCAP. This Court also in Tribe v. Hodel, which we call Stampede Credit Case in our briefs, validated the recovery of the repayment of water as a remedy for the unlawful diversion of water. So this, their whole argument about the rest, they're trying to argue that somehow the 19, the alpine decree enacted in 1980 retroactively invalidated the 1973 OCAP. But what about prospectively? Are you contending that you should have gotten more from the District Court for the period from 80 to 84? We, we just have a small issue about that the Court should, all we're appealing differently from the Tribe is that there were some spills where water went up. You're not appealing the 80 to 84. We are not. We recognize that we have a heavy burden to appeal anything on the remedy. And so we've focused on the two areas where we think the Court just made completely obvious errors. And the first is in the, it's across the board reduction of the USGS published gauge data on which recoupment was based, the recovery was based. How much acreage, acre footage, or whatever one calls it, is that if you, if they used your numbers instead? I think it'll be about 150,000 additional acre feet of water. It's very substantial to us. This, what seemed like a, maybe a minor 10 or 15 percent reduction because it's totally, ends up being a huge, having a huge effect. I think our briefs outline this issue very clearly and, but let me restate. So there's that, there's the spills, and then there's a spill. Right. And then for the 80 to 84 period. Right. And then there's the pre-judgment interest? Right. Now, I have major problems with what, with the whole idea of water interest. It doesn't make any sense to me. So perhaps you can just defend it to begin with. Because interest, it seems to me, by definition, deals with money. The whole point is that you're dealing with the time value of money and the fact that money now and money then is, is, is different. And you, you want to be made whole for the fact that you'd had the money then rather than now. Now, what is the analogy with regard to water? There, it's, it's interesting actually. There is an analogy here with regard to the water. I don't know if there always is, but under the facts of this case, if we, as we have discussed in our reply brief, the recovery plan for the Cuiwi explains that the less water early on, earlier on in the, in the Cuiwi's recovery means that more water is needed later on because the populations don't, the, I don't know, you have to read it. It's a little difficult for me to understand exactly how it works, but you can see their charts in how if you have less water, the Cuiwi, it make less progress in the beginning. But you're saying that, you're saying that water later is less valuable than water earlier? Water earlier is more valuable. I'm sorry, the other way around. Right, the other way around. Exactly. No, well, I said, I said the converse, but the same thing. And that, that then accounts for at least using some factor to take that into account. Yes. Did the district court explain that? The district court, the district court denied pre-judgment interest on two factors without talking at all about the interests of the tribe or the equities or fairness or any of that based on the United States conduct, not the tribe's conduct. And the first factor that he considered was that the United States delayed in bringing suit. Well, that is just wrong. I mean, the district court himself, I actually recently discovered this isn't in our briefs, but in the summary judgment ruling, I believe it's on pages 21 and 22 of the court's opinion, himself says the United States couldn't bring recoupment and action until TCID versus secretary, TCID's challenge to the OCAP had been resolved, which wasn't finally resolved through the Supreme Court until 1985. And what was the loss or destruction of records that somehow impacted the district court's relevance in terms of delay? What were these records that are talked about? Right. The records are a separate issue from delay. The records were several file folders in the mid-Pacific regional office that were destroyed in an office. Well, that was asserted to be the prejudice that somehow accounted for the idea. That is correct. But then the district court says that it would have been helpful to the case to have those documents, but there's no evidence of that in the record. And TCID hasn't cited any. The district court didn't cite any. The record contains in their record sites in our briefs a detailed explanation of how the lawyers, the files had been gone through beforehand, things had been tagged and copied. We really thought we had all the records, and there's no evidence that anything that we didn't have was ---- You wouldn't, if post-judgment interest was not proper, then you wouldn't, you aren't arguing that you're entitled to pre-judgment interest. So would you explain how the post-judgment interest was, how that, how he arrived at a 2 percent figure? I don't know how he arrived at a 2 percent figure. The district court says in his, in the decision that ultimately became the final decision, he says, I'll certify, I'll let you take this up on interlocutory appeal, and then we'll have hearings on the remedy. And that never happened. And we, so we asked for pre-judgment interest. The question of post-judgment interest wasn't addressed. Can I ask, I don't know whether this was ever mentioned in the case, and maybe it's not relevant, but at the end of the Settlement Act provision, it says, In no event shall I ---- no, this is not it. The only relief available from any court of the United States, and this is in any recrimination-related party other than the Secretary, the only relief available will be the issuance of a declaratory judgment, an injunctive relief, directing him to restore the amount of water unlawfully diverted. There's nothing about a case brought by the United States. Is that right? In other words, that sentence would seem to preclude a suit brought by somebody other than the Secretary, any interest notion. Well, the interest, I think that what that provision is, is anticipating if the Secretary didn't bring a recoupment action, the tribe would sue, and the tribe might sue the Secretary as well as TCID, and the tribe couldn't get anything from the U.S. Treasury. Is that the provision? It's also saying that you can only have an injunctive relief directing any unlawful user of the water to restore the amount of water unlawfully diverted, which sounds like that amount of water, not some other amount of water. Well, first of all, this isn't – I don't think falls in that category. Maybe I should need to look at the statute again. I remember that provision provided to suits not brought by the Secretary. Yes. Okay. And I think that there's nothing – you know, there's sort of a presumption, and Congress was – enacted this law under the presumptions that existed, that pre-judgment and post-judgment interest are – But not of water. Is there any case that anybody – where anybody has ever given water interest? I know there's a footnote in a Supreme Court case. Right. But that's what it is. It never happened. Is there any case in which it's ever happened? I – it may have never happened, but it was endorsed by the Supreme Court, and I don't – I couldn't find any other cases. I don't know if this is common. But here, it's clear what Congress wanted. This isn't – this didn't want the tribe to get money damages. It wanted the tribe to get water in the United States in order to fulfill the And I think Congress clearly – you know, the statute has remedial purposes. It intends to make the tribe whole. And I think the record shows that TCID, by not delivering the water earlier on, requires more water to be needed for the – for the fishery later on. And I do think for pre-judgment interest, that solves that problem. And post-judgment interest, really, the TCID's argument is, you know, 1961 – 28 U.S.C. 1961 authorizes only monetary interest, but that's not prohibit – prohibitory. So there's certainly no reason to think that Congress intended to preclude an award of post-judgment interest in this situation. Did the district court ever make a finding of the kind that you're suggesting that the water now and water later – that you need more water now to make up for the loss of water earlier? No, the – it did not. Actually, we – I mean, as I said, it really didn't go into it. And we had – the tribe actually had tried – the CUIWI recovery plan that we have included actually was never – it's a public document, so it can be addressed. And it was brought up. But it wasn't included in evidence because the district court said, oh, you can do that later when we're doing remedy. And then we never did remedy. So we never, you know, had an opportunity to really make these arguments. We did a little bit, you know, a little small thing in our post-judgment – post-trial brief in case he did something like this. But it really was not addressed. I'm still – okay. I'm still trying to understand why we're here 20 years after the Settlement Act. But the timing – I wondered whether you could address the delay issue again. I wasn't quite sure I understood. The Settlement Act was in 1990. Yes. The complaint was filed. There were apparently settlement discussions or something about the Settlement Act. Right. And then the government filed the complaint in 1995. Right. And after that, you know, it's just judicial management. I mean, it's not – Yeah. So then we went to 2003, and here we are. And – okay. So what was the district court referring to in terms of delay, the five years or the – Well, it's not clear to me what the district court was referring to. But it would be inconsistent with his own prior order saying that we couldn't bring – we couldn't really bring recoupment until TCID versus Secretary had been decided. There wasn't a decision that the OCAP were valid. And then we needed a final OCAP in order to be able to do any kind of recovery plan, any kind of recoupment, because you can't do it until you know what the maximum allowable diversions into the project is. But that all brings you to the Settlement Act. But what about after that? Well, the five years? I mean, we spent – you know, it took a year to get settlement negotiations going. We took a couple of years. And then we got our expert report geared up and filed suit. I mean, I don't think five – But it was narrow. Excuse me? I know there's no statute of limitations against the government. But any other party would be faulted for not doing something in five years. Well, the Settlement Act, you know, specifically contemplates that the Secretary will attempt to negotiate. In fact, I think it's Section 209H1 says there are other provisions in the Act that if TCID doesn't settle these provisions don't go into – settle regarding recoupment, these provisions don't go into effect. So, I mean, we were really following Congress's direction in trying to settle for a couple of years. Okay. I think we better hear from the Tribe. Great. Thank you. May it please the Court. I'm Don Springmeier, Counsel for the Tribe. I would like to continue the discussion with the Court on the interest subject, subject to any other questions you might have. And I would like to start by asking you or explaining to you what the Tribe would like you to do about the interest subject. And I'll try to get specifically to Judge Berzin's discomfort with the question of in-kind interest as part of that. First, we would like to – Particularly on this record. In other words, I understand there's a theory about why it might matter, but it doesn't seem to be fleshed out anywhere. Yes, but that doesn't mean it's not right. It means it's not supported by the record. And it certainly isn't supported by the findings. So you're suggesting maybe there ought to be a remand on that issue because there's nothing in the record that really suggests the quantification for 2 percent? At least that, Your Honor, yes. There is no explanation or justification or support in the record for 2 percent as opposed to the debill rate or some other thing that one might imagine. It just appears. The prime rate or something. Or the prime rate or something. I mean, 2 percent doesn't relate to anything. Well, tell us about the concept. Okay. Let me just say one thing, though. Wouldn't it have to relate to some environmentally ascertainable thing, not a monetary issue, because it's not money? But it is equitable. And it is something that has been sanctioned. I think it's, you know, it's in a footnote in Texas versus New Mexico, but it is about as strong a thing as we could have without a holding from the Supreme Court saying, yes, water interest is upheld in this case. They say nothing to the effect that it's not available, that it's not appropriate under public policy considerations, under equitable considerations. It may have been proven up to be appropriate under the facts of that case, but then it would have to be proven up to be appropriate under the facts of this case on an environmental basis, not just by some vague analogy to money. It's not money. No, it's not money, but it's something which, when you're deprived of it for 30 years, is it not – I mean, certainly in the West, water is almost more valuable. It can't be a penalty. It has to be equitable. I agree with that. Equitable means it has to represent making you whole in some way that you weren't made whole. Yes. Yes. And how can you – What would have happened, in other words, if it had been obtained earlier as compared with it being obtained later? Yes. Because, as the counsel for the United States alluded to, and because we did not have a remedy phase in this case, which we all expected and which the judge said we would have, there was no opportunity to put in evidence of the kind we describe, even though it's a public document. But there is – there are facts which can be introduced which justify the fact that more water is needed later than it was earlier from a biological standpoint. So essentially you're suggesting that we remand for a hearing on both phases of – I mean, if we got over the reasons why he denied the prejudgment interest on both phases of interest. Yes. And prejudgment interest is certainly something that we request and requires a remand if you agree that the reasons he denied it completely are not valid or supportable. So what we're asking for is that you hold that in-kind interest in water can be awarded if it's supported by the record, which has not been developed yet in this case and therefore must be remanded for that purpose. Second, I would suggest that the mechanism found in 28 U.S. Code 1961 should be used by analogy, by accord in equity, because how else are you going to decide some particular rate of interest? There's got to be a logical or some kind of analogous basis to do so. 1961 is as good as any as opposed to pulling something out of thin air. But that is out of thin air because it's looking at a different set of considerations, which is what is the value of money in the market. But this isn't about money in the market. I agree. And that's why I'm not saying it governs, but it's appropriate by analogy because you have to use something. And third, we would ask that you instruct on remand the district court specifically in regard to prejudgment interest to weigh the equities as between the tribe and TCID and to take into account the general rule that the plaintiff be made whole and to develop a record which shows how the plaintiff, the tribe, the fish, can be made whole and to take into account the remedial purpose of the statute and the public interest. Those are factors which we see developed in the Supreme Court case law and the Ninth Circuit case law. Now, why water instead of money? Number one, the statute says that as regards the tribe, certainly. We can only ask for water.  We can't ask for money. It wants the water to benefit the fish. That's what this is all about. We're not trying to get even money to buy water because that is much more difficult than getting the water because of the limited total quantity of the resource. So this case is about water and about being made whole. Do you have any vision as to what happens next in this case? Yes. Just a minute. Given the district court's observation that it is not disturbing the water duties of any of the landowners, and essentially, as I understood what he was saying, is that it just may not be possible for the Irrigation District to both return the water it's supposed to return and provide the water to the landowners that they're entitled to get. It is perfectly possible, and it has in fact been happening while this case has been on appeal. And it works like this, Your Honor. Under OCAP, the district can conserve water by implementing measures such as, just to take one example, concrete lining a delivery canal. That makes the project more efficient. Under the present OCAP, they get a bonus. It's called an incentive credit for making the project more efficient than a certain target efficiency set in the OCAP. And that creates a theoretical puddle of water in the reservoir called their incentive credit water. And the way this has been working is that they make the election to turn over that incentive credit water to the Truckee River. That then benefits the fish, repays part of the judgment, and there has not been a lesser delivery of water under beneficial use because they've concrete lined the canal and the water isn't seeping away into the bottom of the ground. But am I right in thinking that that's under an OCAP that's a lot higher than this one would be? I'm sorry. I didn't hear the first part. Isn't that under the current OCAP rather than, I mean, has this equipment started? Yes. The equipment has started.  So you need conservation and you need rain. They don't get incentive credit for rain. No, but I think in order to have an incentive credit. No. The best example is the concrete lining of the canal which makes it more efficient and then they get a bonus. Right. That's what I meant by concrete. Right. And then there's another provision of the judgment which says it can be done through a measure such as purchase and retirement of irrigated land. Right. That's another possible mechanism. So there are ways to do it other than saying, farmer, you get 10% less water. All right. I have one last question. Yes. You also argue with regard to the 80-84 period in the outline decree. Can you just give me a brief outline of your argument? The brief outline and we and the United States set forth the mathematical calculations in our briefs that the 2.92 dealt with in the temporary restraining order was not a duty. It was the average of the various duties of all the different quantities of lands and when you look at what the outline decree did in 1980, it is not truly different by assigning 3.5 to the bottom lands and 4.5 to the bench lands. It isn't truly different in quantity from the statement that 2.92 is the average of all the duties of all the lands, which is what was stated in the temporary restraining order. How can 2.92 be the average of 3.5 and 4.5? Well, 2.92 was actually the average of 2.7, 3.0, 3.5, 4.0, and when you take what the outline decree did, you end up at pretty close to the same thing by having a lesser number of different duties, but applied to only two categories of land. And we go into that in detail in our brief, and it is the reason that they are completely wrong in saying that it eviscerated the OCAP because of the 2.92. What about that $299,000 per acre figure at the bottom in the outline decree? What is that about? I'm sorry, I don't. There's a figure in the outline opinion that says the consumptive use of irrigation water is 2.99 acre feet per acre. Oh, yes. What does that mean? That's one of the only things I've ever agreed with Mr. Van Zandt on. That is the consumptive use that the expert witnesses showed the alfalfa plant uses to grow from nothing. But it's irrelevant because you need more water than that. I agree with that. It's irrelevant because your duty includes a consumptive use and a transportation component and a loss component. Okay. We're all way over time on both sides, I think, aren't we? Okay. So are there any further questions of either side? Thank you. Thank you. The case just argued, matters just argued are submitted for decision.
judges: Shadur, Schroeder, Berzon